## Case No. 14,706.

### UNITED STATES v. CADWALADER et al.

[Gilp. 563.] [1]

District Court. E. D. Pennsylvania. June 4, 1835.

OFFICER—COMPENSATION—CREDITS— DEPARTMENT REGULATIONS.

1. Where a public officer. not appointed or prohibited by law, is employed by the head of a department, his duties and compensation. are to be regulated by the agreement made in the case.

2. No agreement made by the head of a department. with an agent appointed under the act of 3d March, 1809 [2 Stat. 535], will entitle him to more than the compensation allowed thereby.

3. A discretion is vested in the head of a department, to allow a special officer, employed under it, compensation for his services even beyond the amount agreed upon, should he consider them equitably entitled to it.

4. Where the accounts of a public officer, employed by the head of a department under a special contract, are settled, and a certain rate of compensation allowed. he continues to be entitled to the same rate of compensation for similar subsequent services, until a new agreement or notice of change.

5. A claim for a credit. not actually disallowed, is to be considered only as suspended. if disapproved and passed over by the head of a department

6. The regulations of a department of the government in settling its accounts, are intended for general rules in the transaction of its business, but are subject to the revision of a court and jury. when they work manifest injustice to individuals.

This was an action of debt, brought to recover the sum of eleven thousand six hundred and twenty-two dollars and sixty cents, which it was alleged Mr. M'Call in his lifetime had received from the United States for their use, and which was still due and unpaid by his representatives. To this action the defendants [Thomas Cadwalader. Robert M'Call and Thomas Cadwalader. Jr., executors of Richard M'Call, deceased] pleaded the general issue and a set-off, with leave to give the special matter in evidence.

On the 4th June, 1835, the case came on for trial before Judge HOPKINSON and a special jury, when the following facts were proved:

Early in the year 1815, Mr. Richard M'Call was appointed consul of the United States for the port of Barcelona. About the same time, a squadron was sent to the Mediterranean, and it was determined by the navy department to employ him as a special agent for this squadron, to be employed as long as his services should be considered necessary, and with authority to draw bills on certain houses in Europe. A letter of the secretary of the navy of the 7th March, 1815, fixes as his compensation for these services, "a commission of two per cent. on his disbursements, provided the whole sum so allowed should not exceed that authorized to be given to a navy agent," which was two thou-

1 [Reported by Henry D. Gilpin, Esq.]

sand dollars per annum.. Mr. M'Call did not consider this sufficient for the labours and responsibility of such an office, and, on the 12th April, the secretary of the navy, Mr. Crowninshield, agreed to extend the allowance by adding, "a commission of two and a half per cent. on absolute expenditures made when he should be absent from Barcelona, following the squadron;" requiring distinct accounts of disbursements made under those circumstances. Mr. M'Call proceeded to the Mediterranean and commenced his special agency on the 13th July, 1815. From that time until November, 1817, his place of residence on land was at Barcelona, but he was frequently, and for considerable periods, either following the squadron, or at Carthagena, Marseilles, Mahon, or other places which the duties of his agency required him to visit. At the latter period he removed to Gibraltar, considering that the most convenient place for supplying the squadron, and thenceforth it became his place of residence. His accounts were made up at the end of every half year, and transmitted with the vouchers to the treasury department. The compensation which he claimed in these accounts, was always two and a half per cent. on all disbursements made by him for the public service, elsewhere than at Barcelona, and two per cent. on those made there, up to the sum of two thousand dollars per annum: he also charged the United States for the clerk hire, storage and office expenses, which were actually incurred. On the 20th June, 1817, the first settlement of his accounts took place at the treasury, and embraced only those from 13th July to 24th October, 1815: during the whole of that period he was absent with the squadron, and two and a half per cent. on all his disbursements were allowed. On the 25th May, 1821, the auditor having before him for settlement all the accounts from 25th October, 1815, to 1st July, 1820, referred to the secretary of the navy, Mr. Thompson, the claim of Mr. M'Call for two and a half per cent. on his disbursements, after he went to reside at Gibraltar, and also his charges for clerk hire, &c. there. On the 1st June, 1821, the secretary of the navy decided, that Mr. M'Call's compensation was to be regulated by the letters between him and the secretary of the navy, Mr. Crowninshield, in 1815, from which he thought "it fairly to be intended, that his compensation was not to exceed two thousand dollars a year, for all business transacted at his permanent place of residence. At the time the arrangement was made he resided at Barcelona, and the just interpretation of the agreement was, that the same rate of compensation should apply as to all business at his permanent place of residence." He therefore declined allowing him more than at that rate for expenditures at Gibraltar after his removal to that place. On the 4th June, the auditor communicated this decision of the secretary to Mr. M'Call, and in the set-

tlement made on the 22d May, 1822, the whole commissions from October, 1815, to July, 1820, amounting to thirty-one thousand three hundred and fifty-nine dollars and forty cents, were suspended. To this decision Mr. M'Call did not assent, and in 1824 came to the United States for the purpose of having the subject thoroughly investigated and disposed of, declaring at the same time that he should be obliged to relinquish the agency if his claims were refused. His disbursements for the navy department had then amounted to about two millions of dollars, and been attended with no loss to the United States. The subject of the suspended items was fully and carefully re-examined by the secretary of the navy, Mr. Southard, who differed in his view of it from his predecessor, and at the settlement made on the 31st December, 1824, the commissions before suspended, and an additional sum of twelve thousand and twenty-four dollars and twenty-five cents, for subsequent commissions, were carried to his credit: he was also allowed one thousand dollars for clerk hire, and eight hundred and ninety-five dollars for office rent and expenses annually. After this settlement Mr. M'Call resigned his consulate, but returned to Gibraltar and continued to execute his agency. His accounts up to the 1st January, 1828, were from time to time settled on the same basis. On the 3d March, 1830, the auditor having before him the accounts from 1st January, 1828, to 1st January, 1830, containing similar claims for commissions and office expenses, referred them to the secretary of the navy, Mr. Branch, stating that "for those allowances he found no authority in law, in the regulations of the navy department, or in any entry by the secretary upon the vouchers." On the 12th March, the secretary of the navy decided that Mr. M'Call was to receive the same compensation as a navy agent while permanent, and when absent from his place of residence, that agreed on by the secretary of the navy, Mr. Crowninshield, in his letter of 12th April, 1815. On the 15th March, 1830, a settlement was made in accordance with this decision. Mr. M'Call, who had returned home, resigned his agency, and on the 21st April, 1831, a final settlement on the same basis was made at the treasury, by which a balance was asserted to be due to the United States of eleven thousand six hundred and ninety-three dollars and fifty-eight cents. This balance was made up of the following items:

(1) Balance in Mr. M'Call's hands admitted to be due and tendered by him to the treasury.. $ 5,478 94
(2) Commissions on disbursements at Gibraltar over and above the compensation of a navy agent    2,309 26
(3) Commissions on bills of exchange    44 40
(4) Office rent and charges for two years .......................    3,790 00
(5) Subsequent correction ........    70 98

11,693 58

Mr. Gilpin, U. S. Dist. Atty.

This is a question of contract, of written contract. Mr. M'Call was not a navy agent, under the act of 3d March, 1809, whose character, duties and compensation are fixed by law; but a special agent of the navy department, chosen to perform a certain duty pointed out by that department, for which they agreed to allow him a certain compensation. The whole was reduced to writing, weighed by him for more than a month, modified at his suggestion, and again put in writing; he then entered on the stipulated duties. By this contract he must abide. It is found in the letters of himself and the secretary of the navy, Mr. Crowninshield, in March and April, 1815. He was to have the same allowance as a navy agent when at his place of permanent residence. After 1817, this was Gibraltar. In 1820, he claimed more while there; he claimed two and a half per cent. on all disbursements. In 1821, this was submitted to the secretary of the navy, Mr. Thompson, who refused it. In 1824, it was renewed and admitted; but still on the ground of this contract. not in opposition to it. That contract remained unchanged. It speaks for itself. If an erroneous construction was put upon it, the United States are not affected by it. In 1830, the same allowance is again claimed; it is refused as it had been in 1821, and this refusal obliges them to bring the present suit. The defendants make the same demand before this court, which Mr. M'Call made at the treasury; the same reply is given; the contract does not authorize it. U. S. v. Lyman [Case No. 15,647]; U. S. v. Kirkpatrick, 9 Wheat. [22 U. S.] 735; U. S. v. Macdaniel, 7 Pet. [32 U. S.] 1.

M'Call & Cadwalader, for defendants.

If the accounting officers had received the evidence of Mr. Southard's construction of this contract, which has been submitted to the court and jury, they would never have refused these allowances. Their ground of rejection is, that there is no entry of his decision. The case is here to be passed upon with a full knowledge of it. That construction was unquestionably right; but if it were not, it is sufficient to sanction the items of set off which the defendants offer. By the original contract, the compensation was fixed in two contingencies; the first, when Mr. M'Call was at Barcelona, there he had his consulate and its profits, as well as his own business, and the additional compensation of a navy agent was liberal and sufficient; the second, when he had to accompany the squadron, fix his residence for a greater or less time at other places. and sacrifice his own concerns for those of the public, for this he asked and was promised only the customary commercial commission of a merchant, two and a half per cent. The words of the correspondence in 1815, bear this construction, and it is consistent with usage and justice. As to the allowance for office expenses, it is made to navy agents in the United States, and therefore falls within the express stipulation of the letter; but if it were not, it is sanctioned by the usage of the department, which was confirmed by this court in a late case. To say that it was wrong in the secretary of the navy to allow, in 1824, what was rejected in 1821, is to confound together suspension and rejection; these claims were large, and in settling the account they were passed by for further consideration; they were not rejected; they came up in 1824, as matters yet undecided. The decision of Mr. Southard, therefore, was right in all respects, at the time it was made. But that is not the question here. This claim commences four years after Mr. Southard's decision. It commences entirely, after Mr. M'Call had come to this country, conferred with the department, and returned to the Mediterranean with their plighted faith to allow it. The contract, made by the letters of 1815, was at an end; the settlement of 1824 became a contract, which had not been terminated by the government in 1830. No doubt the secretary of the navy might refuse these allowances after that time; but he cannot do so retrospectively; it has been laid down by this court, as well as by the supreme court, that no change in a usage is to be retrospective; that a person, who has for years received a compensation, cannot be deprived of it by the head of a department, who shall construe a contract differently from his predecessors. U. S. v. Macdaniel, 7 Pet. [32 U. S.] 1; U. S. v. Duval [Case No. 15,015]; Armstrong v. U. S. [Id. 548].

Mr. Gilpin, U. S. Dist. Atty., in reply.

In 1815, a contract was deliberately made, between Mr. M'Call and the secretary of the navy, so explicit in its terms, that it cannot be misunderstood. The question is, whether or not that contract allows him two and a half per cent. commissions on all his disbursements at his place of permanent residence, and a regular annual sum of one thousand eight hundred and ninety-five dollars, for office expenses. On its face it certainly does not. At the time of the first settlement these allowances were not claimed; on the contrary, the commissions on disbursements at Barcelona, were charged separately from those on disbursements while absent, and no claim was made for any office expenses. At the time of the second settlement, a similar distinction was made; but it was observed, that after his permanent residence was fixed at Gibraltar, he claimed the extra commissions; this was refused from the outset, and in 1821, was deliberately examined and rejected; it was not merely suspended, for the letter of the secretary of the navy is positive as to the meaning of the contract, and settled the point definitely so far as the department could do so; the suspension was to give time to ascertain the periods of absence and residence at Gibraltar, so as to adjust the ac-

counts; there was no hesitation or suspension as to the propriety of the allowance; up to this time there was no claim even of an annual sum for office charges. In 1824, Mr. M'Call comes to the United States, and a third settlement is made; he puts in a claim again for the extra commissions during his residence at Gibraltar, and an entirely new one for office expenses, the whole amounting to sixty thousand dollars. This was allowed by the secretary of the navy, but not by any change in the contract; it was his interpretation of that instrument; there was no new contract, nor indeed any written order, given at the time, at least none has been found. This act then made no variation in the rights of either party; a claim was made by Mr. M'Call under his contract, at that time, and he obtained it. If his decision was wrong, it cannot affect the rights of the United States; it cannot change their written agreement with their agent; it cannot govern the construction of the instrument on a subsequent occasion. Whenever Mr. M'Call presented his accounts, they were to be settled by the officer for the time being, according to the existing contract; and if at one time an error was made, it is no reason that it should also be made at another; the settlements were from time to time, the contract was continuous; it existed in 1829, as much as in 1815, and alone governed each intermediate settlement. Now the very words of the letters confine the extra commission to disbursements made when absent from the place of permanent residence, and seem to place that item beyond question. As to the office charges, no proof of the same annual allowance to any navy agent was given; much less to a special agent, whose extra commissions gave him so large a compensation. Neither item, then, can be properly allowed under the agreement; and if the view is correct, that this agreement continued in force up to 1830, that no legal change had been made in it, and no new one formed, then the accounting officers were correct in rejecting them, and this jury ought not now to allow them.

HOPKINSON, District Judge (charging jury). (After stating the several charges of the United States against the defendant, which constitute the claim sought to be recovered in this action, and also, generally, the grounds on which it is resisted, the judge instructed the jury on the matters of law arising in the case, substantially as follows:) The jury must bear in mind that the appointment of Mr. M'Call, to the duties of a navy agent, was not made under the act of congress of 3d March, 1809, and of course the question of his compensation for his services is not to be governed by the provisions of that law. Had his appointment been under that law, our course in the decision of this cause would be very plain and easy. We should follow the directions of the law, without regarding the acts or opinions of the

secretary of the navy, as no agreements by him with Mr. M'Call, however explicit, if made in violation of the law, could be attended to here. The defendant, also, is presumed to have known the law by which his office was conferred on him, and to have known further that no contract made by the secretary with him, not warranted by the law, could be enforced in any court of the United States. Mr. M'Call was not appointed by virtue of that act of congress, but under a general authority, lawfully exercised by the secretary of the navy, to appoint agents of the department, who are not, properly speaking, navy agents, nor officers of the United States, but the agents of the secretary or his department. In such cases, where there is no statutory prohibition or limitation, a large discretion is allowed to the departments. In such appointments the duties of the agent, as well as his compensation and emoluments, must be regulated by the agreement made between him and the secretary. The duties and the compensation must wait upon the object of the appointment; they will vary according to the circumstances of each case; they may be permanent or temporary, more or less. We have, then, not to look to the law of 3d March, 1809, for the liquidation of this account, for our guide and rule in settling the claims of the respective parties, but we must look truly and conscientiously to the agreement between them, upon the faith of which the services of the defendant were rendered. The changes that have taken place in the office of secretary of the navy, have probably produced all the difficulties between the defendant and the department, but they can produce no change in any contract made within the authority of the officer who made it.

The original agreement is contained in a correspondence between Mr. Crowninshield, the then secretary of the navy, and Mr. M'Call. The several letters do not appear to me to be ambiguous, at least as regards the principal item of dispute, that is, the commissions or compensation to be allowed to the defendant; and my construction of them inclines to the opinion given upon them by Secretary Thompson, who had succeeded Mr. Crowninshield in the navy department. When Mr. M'Call rendered his first account to the department, or when it was there settled, Mr. Thompson was in office, and had the account settled according to his construction of the contract. If the duties and services of the appointment turned out to be more onerous, important and expensive than was contemplated when the contract was made, they nevertheless can have no operation in changing the meaning or construction of the contract, but they would afford a good and just reason for modifying it for the future, or for making a new and different one, or for the exercise of the secretary's discretion in making allowances to meet these un-

expected contingencies. Thus, if the contract had been made on the basis, that the residence of Mr. M'Call was to be at Barcelona, where living was cheap and commissions low, and where he had also a consulate, and it turned out that the public service required the navy agent to remove to Gibraltar, this would be a fair ground for a new contract, or for additional, equitable allowances. The secretary was not restricted to make no allowances but such as came strictly within the letter of the contract, if he should think there had been services performed, or expenses in that service incurred, not provided for by the contract. It is unfortunate that the secretary who made the agreement was not first called upon to say what was intended by it. His construction would probably have been received as authentic by his successors. The accounts of Mr. M'Call were submitted to the auditor, and by him referred to the secretary, whose decision upon them I am inclined to adopt. It is said Mr. M'Call acquiesced in this decision. Did he do so? It is true he continued to hold the appointment, but to make strong remonstrances against that decision; and it is to be remarked that, in his appeal to the secretary, he takes the ground of his services, and not of the contract, to support his claims. This was correct.

Before Mr. M'Call again rendered his accounts to the department, another secretary, Mr. Southard, came into the office. Mr. M'Call renewed his charges, not only for the period between his first and second accounts, but introduced the very items that had been rejected or suspended by the former secretary. A question has arisen as to what items were rejected and what suspended. It is said that the charge of commissions only was suspended, but that, as to the other disputed items, the opinion of Secretary Thompson is clear, explicit and final. This may or may not have been his intention; but the suspension, as it appears on the account, goes to the whole of it; and we should presume that Mr. M'Call so understood it, as he would hardly have preferred those charges again, in the face of Mr. Thompson's decision, had he continued in office.

The accounts of the defendant were submitted to Secretary Southard, who seems to have given them a full and careful examination, and finally he passed and allowed the accounts, admitting all Mr. M'Call's charges, not only for the period subsequent to his own coming into office, but for the antecedent time, allowing the items which his predecessor had refused or suspended. Mr. Southard must, like the defendant, have considered that these items were suspended, and not finally decided upon by Secretary Thompson. Although Mr. Thompson had given his opinion on the principle on which the account should be settled, yet the items affected by the principle were suspended, and not finally acted upon; they were not closed against future consideration and adjustment, by Mr. Thompson himself, or by a successor to his authority. Whatever may have been his reason for not directly applying his principle to the items in question, Mr. Southard believed, and I cannot say he was mistaken, that the whole account, when it came to him, was open for his examination and judgment; and he acted upon it accordingly. With my understanding of the original contract with Mr. Crowninshield, as I have intimated, I must consider that, in passing this account and allowing the disputed charges of the defendant, he did not proceed on the ground of that contract, for I do not see how it could bear him out; but that he did proceed on a ground equally tenable and firm, that is, by virtue of his general authority, as the head of his department, to exercise his discretion in making compensation to the agents of the department for their services, in conformity with his judgment and views of the justice of the case, after a longer experience and a fuller knowledge of the nature of the defendant's services, had enabled him to appreciate their value, and to estimate more correctly the expenses to which they exposed the agent.

But it is worthy of particular attention, that the account thus settled by Mr. Southard, which contained the very charges formerly suspended or rejected, as it may have been, has been considered by the department to be finally closed; the defendant obtained his credits; they cannot now be disturbed, and no attempt is made by this suit to disturb them. If this suit had been brought for the allowances made by Mr. Southard, anterior to the settlement of 1824, we might have been called upon to look to and construe the original contract; but it is now unnecessary, as the accounts now in controversy, are subsequent to that settlement. Before these accounts of the defendant were presented to the department, another change had taken place in the office of secretary; Mr. Branch had succeeded Mr. Southard. The accounts are sent to the new secretary by the fourth auditor, with certain objections, or rather questions upon them. The result was, that Mr. Branch, going back to the original contract for the adjustment of the accounts, resumed the opinion of Secretary Thompson and adjusted them accordingly, as the district attorney has submitted them to you, that is, refusing the defendant credit for the charges which Mr. Southard had allowed in the previous settlement of his accounts.

We have now arrived at the real question in this case, which is, are we at this time at liberty to go back to the contract between Secretary Crowninshield and Mr. M'Call, and to receive or reject the disputed items of his account, as we shall believe they are or are not warranted by the construction we shall put upon that contract; or, on the other hand, are we not bound by the allowances made by

Secretary Southard, to the defendant in the settlement of his account in 1824, either, as a construction of the contract binding on the United States, or as constituting a new contract for the subsequent services of the defendant? With the opinion I have, and which I have already intimated, of the meaning of that contract, I cannot think that Mr. Southard admitted the charges in question by virtue of that contract; but that he considered them not to have been finally acted upon by his predecessor, that they were, therefore, open to his judgment upon them, and that after receiving the personal explanations of the charges from Mr. M'Call, who had returned to the United States for the purpose of settling this account; after learning from him the real nature and extent of his services, and his extraordinary expenses in performing them, together with the change that had taken place in his situation and residence, and the importance and extent of his duties, the secretary took upon himself, as he clearly had a right to do, if the former secretary had but suspended these charges for further explanation, to make these allowances and fix the compensation of the agent, according to his view of the circumstances shown to him, in support of their justice and equity. In Macdaniel's Case, 7 Pet. [32 U. S.] 1, it is said by the judge, delivering the opinion of the court that "it will not be contended that one secretary has not the same power as another, to give a construction to an act which relates to the business of the department." The court in that case fully recognise the discretion which any one of the great departments of the government must be allowed to exercise, in the distribution of its duties and responsibilities, and that while he regulates the exercise of his powers by the law, it does not follow that he must show a statutory provision for every thing he does.

In the case submitted now to this court and jury, we are not called upon to decide upon the right of Mr. Southard to admit the credits in question, whether they had been suspended or rejected by the former secretary. Whether Mr. Southard was right or wrong in his action upon the account which he settled with the defendant in 1824, and in his allowance of credits to the defendant in that account which had formerly been withheld, is, at this time and in this suit, of no importance. This suit is not brought by the United States to recover back the money, credited and allowed to the defendant by that settlement, upon the allegation, that the secretary transcended his power in allowing those credits, or on any other allegation. No attempt is made to disturb that settlement. This action is now brought to recover from the defendant the money which he retains for his compensation and charges, for services and expenses subsequent to that settlement, and in strict conformity with the allowances that were made to him by the secretary, in that settlement. Then the question is, if it can be called a question, had the secretary a right to make a contract or arrangement with his agent, acting under and by his authority, performing the services of the department under his direction and controul, for the compensation for these services and for the expenses for which he was to be allowed in performing them? If the secretary had this power, if he has made this contract with the defendant, and the defendant, upon the faith of the contract, has gone on to render his services and to disburse his money in the public service, it is for us to inquire, whether Mr. Southard has exercised his discretion discreetly or not; whether he has been too liberal or not in the terms he gave to his agent. That such an arrangement, such a contract, was made, seems to me to be proved beyond a question by the testimony of Mr. Southard, and of Mr. Watkins at that time the fourth auditor of the treasury department, in addition to the evidence afforded by the settlement itself. On the faith of this agreement, Mr. M'Call resigned his consulship at Barcelona, returned to Gibraltar, resumed the duties of his agency, and devoted himself to them. No question has been made of the fidelity and ability with which he performed these duties.

You will observe that this case comes before you, on a more free and extensive ground than it stood at the department, when these credits were refused. The officers of that department looked at the case only as it appeared on their books and records; they decided it by their regulations for the settlement of accounts, which are intended only for general rules in the transaction of the business of the office, and for the government of extraordinary cases. The courts have often revised the decisions made by the strictness of these regulations, where they worked manifest injustice to the individuals concerned. The accounting officers of the department, in this instance, took up the original contract as it appears in the correspondence between Secretary Crowninshield and the defendant; they put their construction upon it, with which I do not find fault, and they stopped there. As they found nothing on their books and records of the subsequent proceedings of Mr. Southard, they paid no attention to them. It is our duty, however, to go further into the truth and justice of the case, and to decide upon the rights of the parties by the laws of the land, and not by the office rules of a department. Upon these principles of law, applied to your own views of the evidence, you will make up your verdict. The defendant admits a balance to be due from him to the United States of five thousand four hundred and seventy-eight dollars and ninety-four cents, which he has always been ready to pay. The United States claim from him the sum of eleven thousand six hundred and twenty dollars and sixty cents, with interest amounting to thirteen hundred and twenty-eight dollars and thirty-one cents. The difference is made by the disputed items in the

defendant's account, upon which you are to decide.

The jury found a verdict for the United States for five thousand four hundred and seventy-eight dollars and ninety-four cents.